THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

FILED
JUN 0 1 2009
WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By _____
Deputy Clerk

| | | |
|---|---|---|
| 1. | PLATTE RIVER INSURANCE COMPANY and | ) ) ) |
| 2. | DARWIN NATIONAL ASSURANCE COMPANY, | ) ) ) ) |
| | Plaintiffs, | ) ) |
| | v. | ) ) |
| 1. | SEMINOLE HEALTH CENTER d/b/a SEMINOLE MEDICAL CENTER; | ) ) ) ) |
| 2. | LUTHER WILLIAMS; | ) ) |
| 3. | CONNIE FAY WILLIAMS; | ) ) |
| 4. | HUSSEIN TORBATI, P.A.C.; | ) ) |
| 5. | HARRY CHAYNE FISHER, D.O.; and | ) ) |
| 6. | JEFFREY L. WATTS, M.D. | ) ) |
| | Defendants. | ) |

CASE NO. CIV 09-213-KEW

This action is not related to any previously filed case in this Court.

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiffs PLATTE RIVER INSURANCE COMPANY and DARWIN NATIONAL ASSURANCE COMPANY (collectively, "Darwin" or "Plaintiffs") seek a judgment declaring that Plaintiffs do not have a duty to defend or indemnify Defendant SEMINOLE HEALTH CENTER d/b/a SEMINOLE MEDICAL CENTER and/or the other defendants in the underlying lawsuit filed by Defendants LUTHER WILLIAMS and CONNIE FAY WILLIAMS. In support of these claims, Plaintiffs allege the following:

Consent given
Waiver of Service given
{805013;}

## PARTIES

1. Plaintiff Platte River Insurance Company ("Platte River") is a corporation organized under the laws of the State of Nebraska, with its principal place of business located in Middleton, Wisconsin, and is authorized to conduct business in Oklahoma. Platte River issued two insurance polices under which Seminole is an insured.

2. Plaintiff Darwin National Assurance Company ("Darwin National") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Farmington, Connecticut, and is authorized to conduct business in Oklahoma. Darwin National issued two insurance policies under which Seminole is an insured.

3. Defendant Seminole Health Center d/b/a Seminole Medical Center ("Seminole") is an Oklahoma limited liability company that was located in and did business in Seminole County, Oklahoma, which is within the geographical jurisdiction of the United States District Court for the Eastern District of Oklahoma.

4. Defendants Luther Williams and Connie Fay Williams (the "Williams" or "Defendants") are residents of Pottawatomie County, Oklahoma, and thus are also within the geographical jurisdiction of the United States District Court for the Eastern District of Oklahoma. The Williams have an interest in this declaratory judgment action.

5. Defendant Hussein Torbati, P.A.C. ("Torbati"), resides in Oklahoma within this judicial district and has an interest in this declaratory judgment action as he is a defendant in the underlying suit.

6. Defendant Harry Chayne Fisher, D.O. ("Fisher"), resides in Oklahoma within this judicial district and has an interest in this declaratory judgment action as he is a defendant in the underlying suit.

7. Defendant Jeffrey L. Watts, M.D. ("Watts"), resides in Oklahoma within this judicial district and has an interest in this declaratory judgment action as he is a defendant in the underlying suit.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the controversy is between citizens of different states and the matter in controversy exceeds $75,000 exclusive of interest and costs.

9. This is an action for declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure, for the purposes of determining a question of actual controversy between the parties as hereinafter more fully appears.

10. This action is currently ripe for adjudication.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Defendants reside in this District, and a substantial part of the events giving rise to this claim occurred in this District.

## FACTUAL BACKGROUND

12. Seminole, as an affiliate and related entity of TSG, Inc., is part of the Chapter 11 bankruptcy reorganization styled *In re TSG, Inc., et al.*, case number 06-80899 in the United States Bankruptcy Court for the Eastern District of Oklahoma (the "Bankruptcy Action").

13. On May 22, 2008, the court in the Bankruptcy Action entered an Agreed Order granting Luther Williams and Connie Fay Williams relief from the automatic stay to proceed with a lawsuit alleging medical negligence against Seminole, provided that any judgment is

satisfied only to the extent of applicable insurance coverage. A copy of the Agreed Order is attached as Exhibit A.

14. On June 26, 2008, the Williams filed a lawsuit against Seminole and Defendants Torbati, Fisher and Watts alleging medical negligence arising out of Luther Williams' treatment as a patient at Seminole (the "Williams Suit"). The Williams Suit, captioned *Luther Williams, Jr. and Connie Fay Williams v. Seminole Health Center, L.L.C., d/b/a Seminole Medical Center, et al.*, case number S-CJ-2008-47, is pending in the District Court of Seminole County, Oklahoma. A copy of the Petition in the Williams Suit is attached as Exhibit B.

15. According to the Petition, Luther Williams was examined and treated by one or more of the Defendants Torbati, Fisher and Watts at the Emergency Room at Seminole Medical Center on June 27, 2006.

16. The Petition alleges that a chest x-ray was ordered and performed on Luther Williams at Seminole. According to the Petition, the doctor interpreting the results of the chest x-ray reported that an underlying lung mass could not be excluded, and therefore recommended a chest CT. The Petition alleges that Seminole and the other defendants failed to report the test results and diagnosis to Luther Williams.

17. The Petition further alleges that, as a result of this failure to deliver the diagnosis, Luther Williams suffered injury, as his lung cancer went undiscovered.

18. By letter of October 15, 2008, counsel for the Williams articulated their position that a primary policy that Darwin issued to TSG, Inc. for the period from July 1, 2006 to July 1, 2007 provided coverage for the Williams Suit. A copy of the October 15, 2008 letter is attached as Exhibit C.

19. After Darwin forwarded additional policies to counsel for the Williams, in a letter dated March 11, 2009, the Williams claimed there was coverage for the Williams Suit under primary and umbrella policies issued to TSG, Inc. for the period from July 1, 2005 to July 1, 2006 as well as primary and umbrella policies issued to TSG, Inc. for the period from July 1, 2006 to July 1, 2007 (collectively, the "Darwin Policies"). In particular, the Williams claimed that the Williams Suit implicated the occurrence-based general liability coverage parts of the Darwin Policies. A copy of the March 11, 2009 letter is attached as Exhibit D.

20. In letters dated December 3, 2008 and April 8, 2009, Darwin informed both Seminole and the Williams that the Darwin Policies provide no coverage for the Williams Suit. Copies of the December 3, 2008 and April 8, 2009 letters are attached as Exhibit E and F.

21. On May 20, 2009, the Williams filed an Amended Petition in the Williams Suit. The factual allegations set forth in the Amended Petition are largely identical to those of the initial Petition described above. Unlike the original Petition, the Amended Petition alleges that Williams was no longer a patient of Seminole Medical Center after his discharge on June 27, 2006. A copy of the Amended Petition is attached as Exhibit G.

22. In addition, the Amended Petition alleges:

The recommendation contained in the x-ray report prepared by Jeffrey L. Watts, M.D. was never brought to the attention of Plaintiff Luther Williams, Jr. This failure to bring this recommendation to Plaintiff's attention constitutes ***general negligence*** by Defendant Seminole Health Center, L.L.C. d/b/a Seminole Medical Center and further constitutes medical negligence by Defendants Hussein Torbati, P.A.C.; Harry Chayne Fisher, D.O., and Jeffrey L. watts, M.D.

(Emphasis added).

23. On May 27, 2009, the court in the Bankruptcy Action entered an Order Modifying Automatic Stay, which permits Darwin to initiate this declaratory judgment action. A copy of the May 27 Order is attached as Exhibit H.

## The Darwin Policies

24. Platte River Insurance Company issued a Healthcare Organization Professional and General Liability Insurance Policy, policy number 0303-0761, to the named insured TSG, Inc. for the period from July 1, 2005 to July 1, 2006 (the "2005-2006 Primary Policy"). A copy of the 2005-2006 Primary Policy is attached as Exhibit I.

25. Under the same policy number, Darwin National Assurance Company issued to the named insured TSG, Inc. a Healthcare Organization Professional and General Liability Insurance Policy for the period from July 1, 2006 to July 1, 2007, and then extended the policy period three times in one month increments through October 1, 2007 (the "2006-2007 Primary Policy"). A copy of the 2006-2007 Primary Policy is attached as Exhibit J. Copies of the policy extensions are attached as Exhibit K.

26. In all respects relevant to this litigation, the terms of the 2005-2006 Primary Policy and the 2006-2007 Primary Policy (collectively, the "Primary Policies") are identical.

27. The Primary Policies contain the following insuring agreements, in relevant part:

> **A. CLAIMS MADE PROFESSIONAL LIABILITY**
>
> The **Insurer** will pay on behalf of the **Insured**, subject to the Limit of Liability set forth in Item 3(a) of the Declarations, **Loss** and **Defense Expenses** in excess of the Deductible stated in Item 4(a) of the Declarations which the Insured becomes legally obligated to pay as a result of a **Claim** alleging a **Medical Professional Incident**, provided always that:
>
> 1. such **Claim** is first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period; and
>
> 2. notice of such **Claim** is given to the **Insurer** in accordance with Section IV.B.1 of this Policy.
>
> The **Insurer** will have the right and duty to defend any such **Claim** brought against the **Insured**, and will do so even if any of the allegations of the **Claim** are groundless, false, or fraudulent.

{805013;}                               6

    B.    **OCCURRENCE-BASED GENERAL LIABILITY**

The Insurer will pay on behalf of the **Insured**, subject to the Limit of Liability set forth in Item 3(c) of the Declarations, **Loss** and **Defense Expenses** in excess of the Deductible stated in Item 4(b) of the Declarations which the **Insured** becomes legally obligated to pay as a result of a **Claim** alleging **Bodily Injury, Property Damage**, or **Personal or Advertising Injury** caused by an **Occurrence**; provided always that:

1. such **Bodily Injury, Property Damage** or **Personal or Advertising Injury** occurs during the Policy Period; and
2. notice of such **Claim** is given to the **Insurer** in accordance with Section IV.B.2 of this Policy.

The **Insurer** will have the right and duty to defend any such **Claim** brought against the **Insured**, and will do so even if any of the allegations of the **Claim** are groundless, false, or fraudulent.

28. The Primary Policies set forth the following relevant definitions:

    D.    "**Bodily Injury**" means physical injury, sickness or disease sustained by a person other than a **Patient**, including mental anguish, emotional distress or death resulting there from.

    E.    "**Claim**" means a written demand seeking monetary damages otherwise covered by this Policy.

    G.    "**Employee**" means a person who has been hired by the **Insured** to perform services, and now has an assigned work schedule and appears on the regular payroll of the **Insured**, with applicable federal, state and local taxes withheld. **Employee** does not include an Independent Contractor.

    L.    "**Insured**" means any of the following:
        1.    the **Named Insured**;
        2.    any **Insured Entity**;
        3.    any **Employee**, but only while acting within the scope of his/her duties as such; and, solely with respect to Insuring Agreements A. and B., **Insured** shall also mean the following:
        4.    any **Volunteer**, but only while acting within the scope of his/her duties as such;

{805013;}        7

5. any member of a duly authorized board or committee of the **Named Insured**, any person communicating information to such board or committee, or any person charged with the duty of acting as a hearing officer or agent of such committee or executing directives of any such board or committee; provided, however, that any such person shall only be an **Insured** while acting within the scope of his/her duties as such;

6. any of the **Insured's** medical directors, administrators, department heads or chiefs of staff, who are not **Employees**, while acting within the scope of their duties as such; provided, however, that such person shall not be an **Insured** for **Claims** arising out of direct patient care rendered or allegedly failed to be rendered by him/her; or

7. any member or partner of a joint venture or partnership specifically designated as such in Schedule B, but only with respect to such member or partner's liability arising out of such designated joint venture or partnership;

and solely with regard to Insuring Agreement A., CLAIMS MADE PROFESSIONAL LIABILITY, **Insured** shall also mean, in the event of the death, incapacity, or bankruptcy of an **Insured**, the estates, heirs, legal representatives and/or assigns of such **Insured**.

Q. **"Medical Professional Incident"** means:

1. an actual or alleged act, error or omission in the **Insured's** rendering of or failure to render **Medical Professional Services**;

2. an actual or alleged act, error or omission in connection with the **Insured's** activities as a member of a duly authorized board or committee of the **Insured**, or as a member of any committee of the medical or professional staff of the **Insured** when engaged in **Peer Review** or **Utilization Review**;

3. an actual or alleged act, error or omission in connection with the **Insured's** activities as a member of an accreditation, standards review or similar board or committee;

4. any actual or alleged act, error or omission in connection with the **Insured's** performance of quality assurance activities; or

5. any actual or alleged act, error or omission in connection with **Good Samaritan Acts**.

{805013;}                               8

R. **"Medical Professional Services"** means services performed by an **Insured** in the treatment or care of any person, including: medical, dental, nursing, psychiatric, osteopathic, chiropractic, dental or other professional care or services; the furnishing or dispensing of medications, drugs, blood, blood products, or medical or surgical supplies, equipment or appliances in connection with such treatment or care; the furnishing of food or beverages in connection with such treatment or care; the providing of counseling or social services in connection with such treatment or care; and the handling of or performance of post-mortem examinations on human bodies.

T. **"Occurrence"** means:

1. With respect to **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in injury neither expected nor intended by the **Insured**;

2. With respect to **Personal or Advertising Injury**, a covered offense as set forth in Definition W.

U. **"Patients"** means any persons or human bodies admitted or registered to receive **Medical Professional Services** from an **Insured**, whether on an inpatient, outpatient or emergency basis.

X. **"Policy Period"** means the period from the Inception Date stated in Item 2(a) of the Declarations to the earlier of the Expiration Date stated in Item 2(b) of the Declarations or the cancellation date.

29. The Primary Policies set forth the following relevant exclusions:

A. **Exclusions Applicable To Insuring Agreement I.A., CLAIMS MADE PROFESSIONAL LIABILITY**

As respects Insuring Agreement I.A., CLAIMS MADE PROFESSIONAL LIABILITY, this Policy shall not apply to any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

1. **Bodily Injury, Property Damage, or Personal or Advertising Injury**, unless such Claim arises out of an **Insured's** alleged rendering of or failure to render **Medical Professional Services**;

\* \* \*

> **B.   Exclusions Applicable to Insuring Agreement I.B., OCCURRENCE-BASED GENERAL LIABILITY**
>
> As respects Insuring Agreement I.B., OCCURRENCE-BASED GENERAL LIABILITY, this Policy shall not apply to any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:
>
> 1. injury to a **Patient**; provided, however, that this Exclusion B.1 shall not apply to any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving: fire or lightning; windstorm or hail; explosion; riot, including riot attending a strike or civil commotion; aircraft or vehicles; smoke; vandalism or malicious mischief; sprinkler leakage; elevator malfunction; earthquake or flood; or structural collapse of a building;
>
> 2. **Bodily Injury, Property Damage,** or **Personal or Advertising Injury** arising out of an **Occurrence** taking place before the Inception Date;

30.   Platte River issued a Healthcare Organization Umbrella Liability Insurance Policy, number 0303-0762, to the named insured TSG, Inc. for the period from July 1, 2005 to July 1, 2006 (the "2005-2006 Umbrella Policy"). A copy of the 2005-2006 Umbrella Policy is attached as Exhibit L.

31.   Under the same policy number, Darwin National Assurance Company issued a Healthcare Organization Umbrella Liability Insurance Policy to the named insured TSG, Inc. for the period from July 1, 2006 to July 1, 2007 (the "2006-2007 Umbrella Policy"). A copy of the 2006-2007 Umbrella Policy is attached as Exhibit M.

32.   In all respects relevant to this litigation, the terms of the 2005-2006 Umbrella Policy and the 2006-2007 Umbrella Policy (collectively, the "Umbrella Policies") are identical.

33.   The Umbrella Policies contain the following Insuring Agreements, in relevant part:

A.  **UMBRELLA CLAIMS MADE PROFESSIONAL LIABILITY**

The **Insurer** will pay on behalf of the **Insured**, subject to the Limits of Liability set forth in the Declarations, **Loss** and **Defense Expenses** in excess of the **Applicable Underlying Limit** for the coverage identified in Item 1 of the Schedule of Underlying Insurance or Underlying Self Insurance which the **Insured** becomes legally obligated to pay as a result of a **Claim** alleging a **Medical Professional Incident**, provided always that:

1.  such **Claim** is first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period.

\*   \*   \*

B.  **UMBRELLA GENERAL LIABILITY**

1.  **Occurrence Based General Liability**

    The Insurer will pay on behalf of the **Insured**, subject to the Limits of Liability set forth in the Declarations, **Loss** and **Defense Expenses** in excess of the **Applicable Underlying Limit** for the coverage identified in Item 2 of the Schedule of Underlying Insurance or Underlying Self Insurance which the **Insured** becomes legally obligated to pay as a result of a **Claim** alleging **Bodily Injury**, **Property Damage**, or **Personal or Advertising Injury** caused by an **Occurrence**; provided always that:

    a.  such **Bodily Injury, Property Damage** or **Personal or Advertising Injury** occurs during the Policy Period; and

    b.  notice of such **Claim** is given to the **Insurer** in accordance with Section IV.D. of this Policy.

This Insuring Agreement is only applicable if so indicated in Item 8 of the Declarations.

\*   \*   \*

C.  **EXCESS FOLLOW FORM LIABILITY**

The **Insurer** will pay on behalf of the **Insured**, subject to the Limit of Liability set forth in the Declarations, **Loss** and **Defense Expenses** in excess of the **Applicable Underlying Limit** for the insurance identified in Items 3 and 4 of the Schedule of Underlying Insurance which the **Insured** becomes legally obligated to pay as a result of a **Claim** covered by such Scheduled Underlying

{805013;}                                11

Insurance. The terms and conditions of such Scheduled Underlying Insurance are, with respect to this Insuring Agreement C., made a part of this Policy, except with respect to:

1. any contrary provision contained in this Policy; or

2. any provision in this Policy for which a similar provision is not contained in the Scheduled Underlying Insurance, in which case the provisions of this Policy will apply. In no event will the coverage provided under this Policy be broader than the coverage provided under the Scheduled Underlying Insurance.

Notwithstanding anything to the contrary contained above, if the Scheduled Underlying Insurance does not provide coverage, for reasons other than exhaustion of the **Applicable Underlying Limit** due to the payment of **Claims**, then this Insuring Agreement C. similarly will not provide coverage.

This Insuring Agreement is only applicable if so indicated in Item 8 of the Declarations.

34. The Umbrella Policies set forth the following relevant Definitions:

   E. **"Bodily Injury"** means physical injury, sickness or disease sustained by a person other than a Patient, including mental anguish, emotional distress or death resulting therefrom.

   F. **"Claim"** means a written demand seeking monetary damages.

   H. **"Employee"** means a person who has been hired by the **Insured** to perform services, and who has an assigned work schedule and appears on the regular payroll of the **Insured,** with applicable federal, state and local taxes withheld. **Employee** does not include an Independent Contractor.

   K. **"Insured"** means any of the following:

   1. the **Named Insured**;

   2. any **Insured Entity**;

   3. any **Employee** or **Volunteer**, but only while acting within the scope of his/her duties as such;

   4. any member of a duly authorized board or committee of the **Named Insured**, any person communicating information to such board or committee, or any person charged with the duty of acting as a hearing officer or agent of such committee or executing

{805013;}                              12

directives of any such board or committee; provided, however, that any such person shall only be an **Insured** while acting within the scope of his/her duties as such;

5. any of the **Insured's** medical directors, students, administrators, department heads or chiefs of staff, who are not **Employees**, while acting within the scope of their duties as such; provided, however, that such person shall not be an **Insured** for **Claims** arising out of direct patient care rendered or allegedly failed to be rendered by him/her; or

6. any member or partner of a joint venture or partnership specifically designate as such in the attached Schedule A, but only with respect to such member or partner's liability arising out of such designated joint venture or partnership;

and solely with regard to Insuring Agreement I.A., UMBRELLA CLAIMS MADE PROFESSIONAL LIABILITY, **Insured** shall also mean, in the event of the death, incapacity, or bankruptcy of an **Insured**, the estates, heirs, legal representatives and/or assigns of such **Insured**.

S. **"Medical Professional Incident"** means:

1. an actual or alleged act, error or omission in the **Insured's** rendering of or failure to render **Medical Professional Services**;

2. an actual or alleged act, error or omission in connection with the **Insured's** activities as a member of a duly authorized board or committee of the **Insured**, or as a member of any committee of the medical or professional staff of the **Insured** when engaged in **Peer Review** or **Utilization Review**;

3. an actual or alleged act, error or omission in connection with the **Insured's** activities as a member of an accreditation, standards review or similar board or committee;

4. any actual or alleged act, error or omission in connection with the **Insured's** performance of quality assurance activities; or

5. any actual or alleged act, error or omission in connection with Good Samaritan Acts. For purposes of this Definition, "Good Samaritan Acts" means acts or services provided by or failed to be provided by the **Insured** in rendering emergency treatment, without remuneration, at the scene of an accident, medical crisis or disaster.

T. **"Medical Professional Services"** means services performed in the treatment or care of any person, including: medical, dental, nursing, psychiatric, osteopathic, chiropractic, dental or other professional care or services; the furnishing or dispensing of medications, drugs, blood, blood

products, medical or surgical supplies, equipment or appliances in connection with such treatment or care; the furnishing of food or beverages in connection with such treatment or care; the providing of counseling or social services in connection with such treatment or care; and the handling of or performance of post-mortem examinations on human bodies.

W. **"Occurrence"** means:

1. with respect to **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in injury neither expected nor intended by the **Insured**;

2. with respect to **Personal and Advertising Injury**, a covered offense as set forth in Definition AA below.

Y. **"Patient"** means any persons or human bodies admitted or registered to receive **Medical Professional Services** from an **Insured**, whether on an inpatient, outpatient or emergency basis.

BB. **"Policy Period"** means the period from the Inception Date shown in Item 2(a) of the Declarations to the earlier of the Expiration Date shown in Item 2(b) of the Declarations or the cancellation date.

35. The Umbrella Policies set forth the following relevant Exclusions:

A. **Exclusions Applicable To Insuring Agreement I.A., UMBRELLA CLAIMS MADE PROFESSIONAL LIABILITY**

As respects Insuring Agreement I.A., UMBRELLA CLAIMS MADE PROFESSIONAL LIABILITY, this Policy shall not apply to any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

1. **Bodily Injury, Property Damage, or Personal or Advertising Injury**, unless such **Claim** arises out of an **Insured's** alleged rendering of or failure to render **Medical Professional Services**;

\*   \*   \*

C. **Exclusions Applicable to Insuring Agreements I.B.1, OCCURRENCE-BASED GENERAL LIABILITY, and I.B.2, CLAIMS MADE GENERAL LIABILITY**

As respects Insuring Agreements I.B.1, OCCURRENCE-BASED GENERAL LIABILITY, and I.B.2, CLAIMS MADE GENERAL LIABILITY, this Policy shall not apply to any **Claim** based on, arising out

of, directly or indirectly resulting from, in consequence of, or in any way involving:

1. injury to a **Patient**; provided, however, that this Exclusion C.1 shall not apply to any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving: fire or lightning; windstorm or hail; explosion; riot, including riot attending a strike or civil commotion; aircraft or vehicles; smoke; vandalism or malicious mischief; sprinkler leakage; elevator malfunction; earthquake or flood; or structural collapse of a building;

2. **Bodily Injury**, **Property Damage**, or **Personal or Advertising Injury** arising out of an **Occurrence** taking place before the Inception Date stated in Item 2(a) of the Declarations;

## COUNT ONE
### (Declaratory Judgment that the Claims Made Professional Liability Coverage Part of the Darwin Policies Provides No Coverage for the Williams Suit)

36. Plaintiffs reassert and re-allege Paragraphs 1-35 as if fully set forth herein.

37. The Claims Made Professional Liability Coverage Part of the Darwin Policies provides coverage for claims "first made against the Insured during the Policy Period or any applicable Extended Reporting Period."

38. The Policy Period for the 2005-2006 Primary Policy and 2005-2006 Umbrella Policy is July 1, 2005 to July 1, 2006.

39. The Policy Period for the 2006-2007 Primary Policy and 2006-2007 Umbrella Policy is July 1, 2006 to July 1, 2007. The 2006-2007 Primary Policy was extended through October 1, 2007.

40. The Williams obtained leave from the Bankruptcy Court to file suit against Seminole on May 22, 2008. The Williams Suit was filed on June 26, 2008. None of the Darwin Policies were in effect during these times, as the 2006-2007 Primary Policy and 2006-2007 Umbrella Policy had expired several months prior.

41. As such, the Williams did not make a claim against Seminole or the other defendants to the Williams Suit during the policy period of any of the Darwin Policies or any applicable Extended Reporting Period.

WHEREFORE, Plaintiffs Platte River Insurance Company and Darwin National Assurance Company respectfully request that this Court:

(A) Enter judgment declaring that the Claims Made Professional Liability Coverage Part of the Darwin Policies provides no defense or indemnity coverage for the Williams Suit; and

(B) Award Plaintiffs all other relief to which they may be entitled.

## COUNT TWO
### (Declaratory Judgment that the Occurrence-Based General Liability Coverage Part of the Darwin Policies Provides No Coverage for the Williams Suit)

42. Plaintiffs reassert and re-allege Paragraphs 1-41 as if fully set forth herein.

43. The Williams Suit alleges that Seminole and the other defendants to the Williams Suit caused injury to Luther Williams by failing to deliver his x-ray report and recommendation for follow-up treatment.

44. Exclusion B(1) of the Darwin Policies precludes coverage under the Occurrence-Based General Liability Coverage Part for any Claim "based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving injury to a Patient."

45. The Darwin Polices define "Patients" as "any persons or human bodies admitted or registered to receive Medical Professional Services from an Insured, whether on an inpatient, outpatient or emergency basis."

46. The Darwin Policies define Medical Professional Services, in relevant part, as "services performed by an Insured in the treatment or care of any person."

{805013;}   16

47. The Williams Suit alleges that Luther Williams was treated as a patient at Seminole Medical Center on June 27, 2006.

48. The Williams Suit alleges that Luther Williams' treatment and care involved the performance of a chest x-ray.

49. The x-ray performed on Luther Williams constitutes Medical Professional Services, as defined by the Darwin Policies.

50. The delivery of the x-ray report and recommendation for follow-up treatment were integral parts of the Medical Professional Services Luther Williams was registered to receive as a patient of Seminole.

51. The injuries Luther Williams allegedly sustained constitute injuries to a patient.

52. As such, Exclusion B(1) applies and precludes coverage for the Williams Suit under the Occurrence-Based General Liability Coverage Part of the Darwin Policies.

WHEREFORE, Plaintiffs Platte River Insurance Company and Darwin National Assurance Company respectfully request that this Court:

(A) Enter judgment declaring that the Darwin Policies provide no defense or indemnity coverage for the Williams Suit under the Occurrence-Based General Liability Coverage Part; and

(B) Award Plaintiffs all other relief to which they may be entitled.

### COUNT THREE
### (Declaratory Judgment that the Darwin Policies Provide No Coverage for the Williams Suit)

53. Plaintiffs reassert and re-allege Paragraphs 1-52 as if fully set forth herein.

54. The Darwin Policies provide no coverage for the Williams Suit as to any of the Defendants.

WHEREFORE, Plaintiffs Platte River Insurance Company and Darwin National Assurance Company respectfully request that this Court:

(A) Enter judgment declaring that the Darwin Policies provide no defense or indemnity coverage for the Williams Suit as to any of the Defendants; and

(B) Award Plaintiffs all other relief to which they may be entitled.

Respectfully Submitted,

Sidney K. Swinson, OBA No. 8804
Tammy D. Barrett, OBA No. 14182
John D. Dale OBA No. 19787
GableGotwals
1100 ONEOK Plaza
100 West Fifth Street
Tulsa, Oklahoma 74103-4217
(918) 595-4800
(918) 595-4990 (fax)
jdale@gablelaw.com
bkcyfilings@gablelaw.com
*One of the Attorneys for Darwin*

*Of Counsel:*

Scott E. Turner
Brian P. Cummings
TROUTMAN SANDERS LLP
55 West Monroe Street
Suite 3000
Chicago, IL  60603-5757
312.759.1920
scott.turner@troutmansanders.com

1011125v7
{805013;}                    18