IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

PLATTE RIVER INSURANCE COMPANY  )
and DARWIN NATIONAL ASSURANCE   )
COMPANY,                        )
                                )
            Plaintiffs,         )
                                )
v.                              )   Case No. CIV-09-213-KEW
                                )
SEMINOLE HEALTH CENTER d/b/a    )
SEMINOLE MEDICAL CENTER;        )
LUTHER WILLIAMS;                )
CONNIE FAY WILLIAMS;            )
HUSSEIN TORBATI, P.A.C.;        )
HARRY CHAYNE FISHER, D.O.;      )
and JEFFREY L. WATTS, M.D.,     )
                                )
            Defendants.         )

## OPINION AND ORDER

This matter comes before the Court on the parties' cross motions for summary judgment (Docket Entry #38, #42, and #44) as well as the supplemental briefing to these motions. At the Scheduling Conference conducted in this case, counsel agreed that the legal issues should be resolved by dispositive motions, resulting in the early filing of the subject motions. Upon review and consideration of the briefs filed by the parties, this Court renders this ruling.

On June 26, 2008, Defendants Luther Williams and Connie Fay Williams ("Williams") filed an action in the District Court in and for Seminole County, Oklahoma against Defendants Seminole Health Center, L.L.C. d/b/a Seminole Medical Center ("Seminole"), Hussein Torbati, P.A.C. ("Torbati"), Harry Chayne Fisher, D.O. ("Fisher"),

and Jeffrey L. Watts, M.D. ("Watts"). Williams alleged medical negligence against the defendants when he presented himself to Seminole's emergency room and was examined by Torbati. A chest x-ray was allegedly ordered and interpreted by Watts. Watts could not exclude a lung mass and recommended a chest CT scan. Williams allege that the recommendation was never brought to Luther Williams' attention and was not performed. Later, it was determined that Luther Williams had lung cancer that eventually metastasized to his brain. Williams allege Defendants were negligent in not bringing the recommendation for a CT scan to him.

On May 20, 2009, Williams filed an Amended Petition in the state court action. The Amended Petition adds information concerning Luther Williams' discharge from Seminole. Williams contend Luther Williams was discharged from Seminole on June 27, 2006, after undergoing the chest x-ray. They allege Watts' recommendation that Mr. Williams also undergo a chest CT and the alleged failure to communicate the recommendation to him occurred after Luther Williams was discharged from Seminole.

Plaintiffs Platte River Insurance Company ("Platte River") and Darwin National Insurance Company ("Darwin")(collectively referred to as "Plaintiffs") filed this action for declaratory judgment to establish their obligations under four insurance policies they issued to Seminole – two by Platte River and two by Darwin. The resolution of the legal issues in this case involve the

2

interpretation of certain language in these policies.

Specifically, Platte River issued a Healthcare Organization Professional and General Liability Policy and a Healthcare Organization Umbrella Liability Insurance Policy covering the period from July 1, 2005 to July 1, 2006. Darwin issued a primary and umbrella policies for the period from July 1, 2006 to July 1, 2007, which was extended to October 1, 2007.

The policies at issue contain the following language concerning the agreements for coverage:

    A.    **CLAIMS MADE PROFESSIONAL LIABILITY**

> The **Insurer** will pay on behalf of the **Insured**, subject to the Limit of Liability set forth in Item 3(a) of the Declarations, **Loss** and **Defense Expenses** in excess of the Deductible state in Item 4(a) of the Declarations which the Insured becomes legally obligated to pay as a result of a **Claim** alleging a **Medical Professional Incident**, provided always that:
>
>   1.   such **Claim** is first made against the **Insured** during the **Policy Period** or any applicable Extended Reporting Period; and
>
>   2.   notice of such **Claim** is given to the **Insurer** in accordance with Section IV.B.1 of this Policy.
>
> The **Insurer** will have the right and duty to defend any such **Claim** brought against the **Insured**, and will do so even if any of the allegations of the **Claim** are groundless, false, or fraudulent.

    B.    **OCCURRENCE-BASED GENERAL LIABILITY**

> The **Insurer** will pay on behalf of the **Insured**, subject to the Limit of Liability set forth in Item 3(c) of the Declarations, **Loss** and **Defense Expenses** in excess of the Deductible stated in Item 4(b) of

the Declarations which the **Insured** becomes legally obligated to pay as a result of a **Claim** alleging **Bodily Injury**, **Property Damage**, or **Personal or Advertising Injury** caused by an **Occurrence**; provided always that:

1. such Bodily Injury, Property Damage or Personal or Advertising Injury occurs during the Policy Period; and

2. notice of such **Claim** is given to the **Insurer** in accordance with Section IV.B.2 of this Policy.

The **Insurer** will have the right and duty to defend any such **Claim** brought against the **Insured**, and will do so even if any of the allegations of the **Claim** are groundless, false, or fraudulent.

Definitions of some of the terms of the policies are set forth as follows:

\* \* \*

D. "**Bodily Injury**" means physical injury, sickness or disease sustained by a person other than a Patient, including mental anguish, emotional distress or death resulting there from.

E. "**Claim**" means a written demand seeking monetary damages otherwise covered by this Policy.

\* \* \*

R. "**Medical Professional Services**" means services performed by an **Insured** in the treatment or care of any person, including: medical, dental, nursing, psychiatric, osteopathic, chiropractic, dental or other professional care or services; the furnishing or dispensing of medications, drugs, blood, blood products, or medical or surgical supplies, equipment or appliances in connection with such treatment or car; the furnishing of food or beverages in connection with such treatment or care; the providing of counseling or social services in connection with such treatment or care; and the handling of or performance of post-mortem

4

    examinations on human bodies.

T. "**Occurrence**" means:

  1. With respect to **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in injury neither expected nor intended by the **Insured**;

  2. With respect to **Personal** or **Advertising Injury**, a covered offense as set forth in Definition W.

U. "**Patients**" means any persons or human bodies admitted or registered to receive **Medical Professional Services** from an **Insured**, whether on an inpatient, outpatient or emergency basis.

X. "**Policy Period**" means the period from the Inception Date stated in Item 2(a) of the Declarations to the earlier of the Expiration Date stated in Item 2(b) of the Declarations or the cancellation date.

The policies also contain the following exclusions made relevant by the facts of this case:

       \* \* \*

B. **Exclusions Applicable to Insuring Agreement I.B., OCCURRENCE-BASED GENERAL LIABILITY**

As respects Insuring Agreement I.B., OCCURRENCE-BASED GENERAL LIABILITY, this Policy shall not apply to any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

1. injury to a **Patient**; provided, however, that this Exclusion B.1 shall not apply to any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving: fire or lightning; windstorm or hail; explosion; riot, including riot attending a strike or civil commotion; aircraft or vehicles; smoke; vandalism or malicious mischief; sprinkler leakage;

>    elevator malfunction; earthquake or flood; or structural collapse of a building;
>
>    2. **Bodily Injury**, **Property Damage**, or **Personal or Advertising Injury** arising out of an **Occurrence** taking place before the Inception Date;

\* \* \*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that, there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of showing that there is an absence of any issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. <u>Posey v. Skyline Corp.</u>, 702

F.2d 102, 105 (7th Cir. 1983).

Under Oklahoma law, the interpretation of an insurance contract, including whether provisions of the contract are ambiguous, is determined by the court as a matter of law. Dodson v. St. Paul Ins. Co., 812 P.2d 372, 376 (Okla. 1991). If the insurance contract contains no ambiguity, a court must construe it language in accordance with the plain, ordinary meaning of its terms. Haworth v. Jantzen, 172 P.3d 193, 197 (Okla. 2006). In most cases of interpretation of insurance contracts, certain rules are routinely applied by the court, including: (1) ambiguities are construed most strongly against the insurer; (2) in cases of doubt, words of inclusion are liberally applied in favor of the insured and words of exclusion are strictly construed against the insurer; (3) an interpretation which makes a contract fair and reasonable is selected over that which yields a harsh or unreasonable resulted; (4) insurance contracts are construed to give effect to the parties' intentions; (5) the scope of an agreement is not determined in a vacuum, but instead with reference to extrinsic circumstances; and (6) words are given effect according to their ordinary or popular meaning. Max True Plastering Co. v. U.S. Fidelity and Guarantee Co., 912 P.2d 861, 865 (Okla. 1996).

Plaintiffs first assert the Williams' claims are not covered by the Claims Made Professional Liability coverage part of the Darwin policies because the claims were not asserted during the

policy period within which coverage was effective. Williams do not contest this position and, further, contend they never asserted coverage under this provision of the policies.

Plaintiffs next contend the claims are not covered by the Occurrence-Based General Liability coverage portion of the policies because the asserted claims fall within the express exclusion of Exclusion B.1 covering the rendering of Medical Professional Services. Plaintiffs base their position upon the contention that (1) Mr. Williams remained registered to receive Medical Professional Services from Seminole and the medical personnel involved in this case; (2) the Williams were asserting a claim for the failure to provide follow-up care which constitutes Medical Professional Services, as defined by the policies; and (3) Mr. Williams remained a patient so long as he awaited follow-up care.

In interpreting the policy language under the facts as alleged by Williams, this Court finds no ambiguity which would require resorting to the use of interpretive rules of construction outside the four corners of the insurance contract itself. Despite Williams' contention that communication of the results of his x-rays did not require the rendering of Medical Professional Services, the act of informing Mr. Williams of his test results is simply a continuation of "services performed by an [physician] in the treatment or care of any person" - the very definition of Medical Professional Services under the policy. Moreover, Mr.

Williams' continuation as a "patient" was a necessary component of any obligation by the physicians at Seminole to insure he received his results from testing performed while he was admitted to the facility. The discharge of the patient does not "de-register" them from the facility such that the physicians rendering care are relieved of any further obligation - ethically and legally - to communicate the results of their rendering of medical care.

Perhaps most importantly, however, is the obligation to render follow-up care. A key component of Williams' claims is the failure of those rendering care to Mr. Williams to order a follow-up CT scan, which presumably would have revealed the nature of the lung mass found by Watts. It is clear under the most accepted definition of professional services that the rendering of follow-up care, its advisability, risks, and nature requires "specialized knowledge, labor, or skill." Curtis Ambulance of Florida, Inc. v. Board of County Comm. of the Co. of Shawnee, Kansas, 811 F.2d 1371, 1379 (10th Cir. 1987) quoting Marx v. Hartford Accident & Indem. Co., 157 N.W.2d 870, 871-72 (Neb. 1968). Oklahoma state courts have recognized that follow-up care requires the specialized training of a medical professional and that physician has an ethical obligation to render such care. Vance v. Molina, 28 P.3d 570, 574 (Okla. 2001). Until that obligation to render these Medical Professional Services is fulfilled, Mr. Williams remained a patient as defined by the policy, as one who remained registered

to receive Medical Professional Services to receive inpatient or outpatient care. As a result, this Court concludes that in accordance with the clear, unambiguous language of the policy in question Claims Made Professional Liability coverage does not apply since Williams failed to make a claim within the time specified by the policy and the facts of this case require the application of Exclusion B. 1 under the Occurrence Based General Liability coverage portion of the policy. Since no further relief is requested in this declaratory judgment action, judgment will be rendered accordingly.

Torbati's summary judgment motion would only have a bearing upon this case if this Court had found coverage under the policies in question, since it addressed the question as to whether he was an employee of Seminole at the time of the alleged negligence. As a result, the motion will be denied.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment (Docket Entry #38) is hereby **GRANTED**.

IT IS FURTHER ORDERED that Defendants Luther and Connie Williams' Cross-Motion for Summary Judgment (Docket Entry #44) is hereby **DENIED**.

IT IS FURTHER ORDERED that Defendant Hussein Torbati's Counter Motion for Summary Judgment (Docket Entry #49) is hereby **DENIED**.

IT IS SO ORDERED this 30th day of September, 2010.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE